IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 15-3440

MONARCH BEVERAGE COMPANY, INC.,
Plaintiff/Appellant,

v.

DAVID COOK, in his official capacity as Chairman of the Indiana Alcohol and
Tobacco Commission, *et al.*,
Defendants/Appellees.

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:13-cv-1674-SEB-MJD,
The Honorable Sarah Evans Barker, Judge

**BRIEF OF APPELLEES**

GREGORY F. ZOELLER
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

Office of the Attorney General          HEATHER HAGAN McVEIGH
IGC South, Fifth Floor                  LARA LANGENECKERT
302 W. Washington Street                JONATHAN R. SICHTERMANN
Indianapolis, IN 46204                  Deputy Attorneys General
(317) 232-6255
Tom.Fisher@atg.in.gov                   *Counsel for Defendants/Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUE .............................................................. 1

STATEMENT OF THE CASE.................................................................. 2

    I.      The Wholesale Tier and Prohibited-Interest Laws................................ 3

    II.     Monarch Beverage Company ..................................................... 4

    III.    Procedural History ............................................................................. 7

SUMMARY OF THE ARGUMENT ............................................................ 9

ARGUMENT ........................................................................................ 12

    I.      Monarch Has No Equal Protection Claim Because the Prohibited-Interest Laws Treat *All* Wholesalers of Alcohol Equally .................... 12

         A.     Monarch has identified no similarly situated class that receives preferential treatment under the prohibited-interest laws................................................................................. 13

         B.     Monarch cannot cast its claim in any way that will allow it to evade the "similarly situated" requirement ......................... 22

    II.     The Prohibited-Interest Laws Are Justified by the General Post-Prohibition Policy of Limiting the Size, Scale, and Influence of Large Alcoholic Beverage Companies .................................................. 26

         A.     States have long regulated beer and liquor differently owing to different economic and social consequences; segmenting wholesalers addresses those differences and promotes temperance-related goals ............................................................. 27

         B.     The interest in preventing tied houses arises from post-Prohibition efforts to establish an orderly regulatory regime that would promote temperance and prevent a concentration of economic power and abuses of such power .............................. 31

         C.     Beer wholesalers, but not liquor wholesalers, benefit from franchise protections, an advantage that reasonably justifies maintaining the barrier between beer and liquor distributors .................................................................................. 41

         D.     Monarch has not negated, and cannot negate, these interests and their connection to the prohibited-interest statutes ........... 46

     1.     Monarch's historical counter-narrative, even if accurate, has no bearing on the legitimacy of the State's objectives ............................................... 46

     2.     The availability of other controls does not undermine the prohibited-interest statutes ....................................... 51

CONCLUSION ................................................................................................... 54

CERTIFICATE OF WORD COUNT ......................................................... 55

CERTIFICATE OF SERVICE ..................................................................... 56

# TABLE OF AUTHORITIES

**CASES**

Bayview-Lofberg's Inc. v. City of Milwaukee,
905 F.2d 142 (7th Cir. 1990) ............................................................ 20

Cal. Beer Wholesalers Ass'n, Inc. v. Alcoholic Beverage Control Appeals Bd.,
487 P.2d 745 (Cal. 1971) .............................................................. 40

City of Cleburne v. Cleburne Living Ctr.,
473 U.S. 432 (1985) ...................................................................... 47

Corbitt v. New Jersey,
439 U.S. 212 (1978) ...................................................................... 17

Dep't of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.,
128 Cal. App. 4th 1195 (Cal. Ct. App. 2005) ......................... 40

Dickerson v. Bailey,
336 F.3d 388 (5th Cir. 2003) ...................................................... 40

Engquist v. Or. Dep't of Agric.,
553 U.S. 591 (2008) ...................................................................... 23

Falls v. Town of Dyer,
875 F.2d 146 (7th Cir. 1989) ...................................................... 25

FCC v. Beach Commc'ns, Inc.,
508 U.S. 307 (1993) ............................................................... passim

Flying J Inc. v. City of New Haven,
549 F.3d 538 (7th Cir. 2008) ............................................... 25, 26

Frey Corp. v City of Peoria,
735 F.3d 505 (7th Cir. 2013) ...................................................... 20

Goodpaster v. City of Indianapolis,
736 F.3d 1060 (7th Cir. 2013) .................................................... 23

Gosnell v. City of Troy, Ill.,
59 F.3d 654 (7th Cir. 1995) ................................................... 21, 53

Granholm v. Heald,
544 U.S. 460 (2005) ........................................................................ 2

*Granite State Grocers Ass'n v. State Liquor Comm'n,*
  289 A.2d 399 (N.H. 1972) ........................................................ 40

*Harris v. McRae,*
  448 U.S. 297 (1980) ................................................................ 19

*Harvey v. Town of Merrillville,*
  649 F.3d 526 (7th Cir. 2011) ..................................................... 8

*Heller v. Doe,*
  509 U.S. 312 (1993) .................................................................. 9

*Hooper v. Bernalillo Cnty. Assessor,*
  472 U.S. 612 (1985) ................................................................ 46

*Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook,*
  808 F.3d 318 (7th Cir. 2015) ..........................................*passim*

*LaBella Winnetka, Inc. v. Vill. of Winnetka,*
  628 F.3d 937 (7th Cir. 2010) .................................................... 23

*Lehnhausen v. Lake Shore Auto Parts Co.,*
  410 U.S. 356 (1973) ................................................................ 48

*Lochner v. New York,*
  198 U.S. 45 (1905) .............................................. 19, 20, 21, 53

*Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of
  Am.,*
  485 U.S. 360 (1988) ................................................................ 46

*Matter of Gifford,*
  688 F.2d 447 (7th Cir. 1982) .................................................... 20

*Miller Brewing Co. v. Best Beers of Bloomington, Inc.,*
  579 N.E.2d 626 (Ind. Ct. App. 1991).................................... 6, 7

*Miller Brewing Co. v. Best Beers of Bloomington, Inc.,*
  608 N.E.2d 975 (Ind. 1993) ...................................................... 7

*Monarch Beverage Co. v. Cook,*
  No. 49A02-1504-PL-245, 2015 WL 9197720
  (Ind. Ct. App. Dec. 17, 2015) ...................................... 14, 16, 24

CASES [CONT'D]

*Nat'l Paint & Coatings Ass'n v. City of Chicago,*
    45 F.3d 1124 (7th Cir. 1995) ................................................................. 21

*Neel v. Tex. Liquor Control Bd.,*
    259 S.W.2d 312 (Tex. Civ. App. 1953) ................................................ 40

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) ................................................................................... 18

*North Dakota v. United States,*
    495 U.S. 423 (1990) ................................................................................. 2

*Polenz v. Parrott,*
    883 F.2d 551 (7th Cir. 1989) ................................................................. 20

*Romer v. Evans,*
    517 U.S. 620 (1996) ............................................................................... 47

*Strail v. Vill. of Lisle,*
    588 F.3d 940 (7th Cir. 2009) .......................................................... 10, 13

*Trafelet v. Thompson,*
    594 F.2d 623 (7th Cir. 1979) .......................................................... 17, 18

*United States v. Moore,*
    644 F.3d 553 (7th Cir. 2011) ................................................................. 18

*Vance v. Bradley,*
    440 U.S. 93 (1979) ................................................................................. 17

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000) ............................................................................... 26

*Williamson v. Lee Optical of Oklahoma, Inc.,*
    348 U.S. 483 (1955) ............................................................................... 54

*Wis. Educ. Ass'n Council v. Walker,*
    705 F.3d 640 (7th Cir. 2013) .......................................................... 18, 24

*Zobel v. Williams,*
    457 U.S. 55 (1982) ................................................................................. 44

FEDERAL STATUTES

28 U.S.C. § 1291 ........................................................................................... 1

**FEDERAL STATUTES [CONT'D]**

28 U.S.C. § 1331 .................................................................... 1

42 U.S.C. § 1983 .................................................................... 1

Federal Alcohol Administration Act § 5(a), Chapter 814, 49 Stat. 981
(1935) ........................................................................... 33

**STATE STATUTES**

Ind. Code tit. 7.1 ............................................................ 2, 38

Ind. Code ch. 7.1-3-4 ............................................................ 38

Ind. Code ch. 7.1-3-6 ............................................................ 38

Ind. Code ch. 7.1-3-14 ........................................................... 38

Ind. Code § 7.1-1-1-1 ........................................................ 2, 48

Ind. Code § 7.1-1-2-1 ............................................................ 48

Ind. Code § 7.1-1-2-3(a)(4) ...................................................... 38

Ind. Code § 7.1-3-3-1 ......................................................... 3, 4

Ind. Code § 7.1-3-3-4 ............................................................ 15

Ind. Code § 7.1-3-3-19 ......................................................*passim*

Ind. Code § 7.1-3-4-1 ............................................................. 2

Ind. Code § 7.1-3-5-1 ............................................................. 2

Ind. Code § 7.1-3-5-2(a) ......................................................... 37

Ind. Code § 7.1-3-6-16 ........................................................... 38

Ind. Code § 7.1-3-8-1 ......................................................... 3, 4

Ind. Code § 7.1-3-9-1 ............................................................. 2

Ind. Code § 7.1-3-9-2 ............................................................ 38

Ind. Code § 7.1-3-9-3 ............................................................ 38

Ind. Code 7.1-3-10-1 .............................................................. 2

Ind. Code § 7.1-3-10-2 ........................................................................... 37

Ind. Code § 7.1-3-10-4 ........................................................................... 37

Ind. Code § 7.1-3-10-5 ........................................................................... 37

Ind. Code § 7.1-3-13-1 ................................................................... 3, 4, 13

Ind. Code § 7.1-3-14-1 ............................................................................. 2

Ind. Code § 7.1-3-15-1 ............................................................................. 2

Ind. Code § 7.1-3-15-2 ........................................................................... 37

Ind. Code § 7.1-3-25-4.5(b) ...................................................................... 6

Ind. Code § 7.1-3-25-7 ....................................................................... 6, 42

Ind. Code § 7.1-3-25-8 ....................................................................... 6, 42

Ind. Code § 7.1-3-25-9 ....................................................................... 6, 42

Ind. Code § 7.1-3-25-13 ..................................................................... 6, 42

Ind. Code § 7.1-4-2-1 ............................................................................. 39

Ind. Code § 7.1-4-3-1 ............................................................................. 39

Ind. Code § 7.1-4-4-1 ............................................................................. 39

Ind. Code § 7.1-5-5-9(c) ..................................................................... 6, 42

Ind. Code § 7.1-5-5-9(d) ........................................................................... 6

Ind. Code § 7.1-5-6-1(a) ......................................................................... 38

Ind. Code § 7.1-5-9-2 ......................................................................... 2, 38

Ind. Code § 7.1-5-9-3 ..................................................................... *passim*

Ind. Code § 7.1-5-9-4 ..................................................................... *passim*

Ind. Code § 7.1-5-9-6 ..................................................................... *passim*

Ind. Code § 7.1-5-9-7 ............................................................................. 2

**STATE STATUTES [CONT'D]**

Ind. Code § 7.1-5-9-8 ................................................................ 2

Ind. Code § 7.1-5-9-9 ............................................................ 2, 16

Ind. Code § 7.1-5-9-10 .............................................................. 2

Iowa Code Ann. § 123.22 ......................................................... 30

Mich. Comp. Laws § 436.1203(6) ............................................ 30

Mich. Comp. Laws § 436.1305 ................................................. 30

Mich. Comp. Laws § 436.1403 ................................................. 30

Mont. Code Ann. § 16-3-101(2)(a)(ii) ...................................... 30

Mont. Code Ann. § 16-3-230 .................................................... 30

Vt. Stat. Ann. Title 7, § 63(a) .................................................. 30

Vt. Stat. Ann. Title 7, § 63(b) .................................................. 30

W. Va. Code Ann. § 11-16-9 ..................................................... 30

W. Va. Code Ann. § 60-3-1 ....................................................... 30

Wyo. Stat. Ann. § 12-2-201(a) .................................................. 31

Wyo. Stat. Ann. § 12-2-301(a) .................................................. 30

**OTHER AUTHORITIES**

Carole L. Jurkiewicz & Murphy Painter, *Social and Economic Control of Alcohol: The 21st Amendment in the 21st Century* (2008) .................................... 31

H.B. 399, Ind. H.R. Journal, 79th Reg. Sess. (Ind. 1935) .......................................... 37

Harold C. Feightner, *150 Years of Brewing in Indiana* (1966) .................................. 36

Harold C. Feightner, *Wet and Dry Legislation in Indiana (1790–1957)* (1957) ....................................................... 34, 35, 36

Harry G. Levine, *The Alcohol Problem in America: From Temperance to Alcoholism*, 79 British J. of Addiction 109 (1984) ................................... 32

Marc Carmichael & Harold Feightner, *A History of Alcohol and Politics in Indiana* (2012) ........................................................................................... 36

Pamela S. Erickson, *Return of the Tied House? The Problems of Domination by Large Companies*, Campaign for a Healthy Alcohol Marketplace (Dec. 2015), http://healthyalcoholmarket.com/pdf/ newsletterdecember2015.pdf ................................................................................ 41

Phillip J. Cook, *Paying the Tab: The Economics of Alcohol Policy* (2007)........... 30, 31

Raymond Fosdick & Albert Scott, *Toward Liquor Control* (Ctr. For Alcohol Policy 2011) (1933) .........................................................................................*passim*

Roland Zullo et al., *The Fiscal and Social Effects of State Alcohol Control Systems*, University of Michigan (May 2013), *available at* http:// irlee.umich.edu/Publications/Docs/FiscalAndSocialEffectsOfStateAlcoho lControlSystems.pdf ............................................................................................ 30

*Selected Articles on Prohibition of the Liquor Traffic* (2d ed. 1917) ......................... 32

Sen. Millard E. Tydings, *Before and After Prohibition* (1930).................................. 32

William C. Kerr et al., *Estimates of the Mean Alcohol Concentration of the Spirits, Wine, and Beer Sold in the United States and Per Capita Consumption: 1950 to 2002,* Alcoholism: Clinical and Experimental Research, vol. 30, issue 9 (Sept. 2006)................................................................. 28

## JURISDICTIONAL STATEMENT

The jurisdictional statement of the Appellant is not complete and correct. Plaintiff/Appellant Monarch Beverage Co., Inc. ("Monarch") filed this action pursuant to 42 U.S.C. § 1983, seeking a declaration that Indiana Code §§ 7.1-3-3-19, 7.1-5-9-3, 7.1-5-9-4, and 7.1-5-9-6 violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and an injunction against Defendants/Appellees ("the State") in their official capacities. Appellant's App. ("App") 36–37. Monarch is an Indiana corporation with its principal place of business in Indianapolis, Indiana. *Id*. at 26. The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The district court entered final judgment in favor of the State on September 30, 2015, thereby disposing of all parties' claims. App. 22. No motion for a new trial or alteration of the judgment or any other motion tolling the time within which to appeal was filed. Monarch filed a timely notice of appeal on October 30, 2015. District Court Electronic Filing Number ("ECF No.") 115. This is not an appeal from a decision of a magistrate judge.

## STATEMENT OF THE ISSUE

May a State, consistent with the Equal Protection Clause, preclude all alcohol wholesalers from holding interests in both a beer wholesaler's permit and a liquor wholesaler's permit?

## STATEMENT OF THE CASE

Indiana extensively regulates the alcoholic beverage industry within its borders, and has done so since the end of Prohibition. The stated purpose of alcohol regulation in Indiana is threefold: (1) "[t]o protect the economic welfare, health, peace, and morals of the people of this state"; (2) "[t]o regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages"; and (3) "[t]o provide for the raising of revenue." Ind. Code § 7.1-1-1-1.

As with most states, the structure of Indiana's commercial alcohol regulatory system is based on three operational licensing tiers: producers (including suppliers), wholesalers (including distributors), and retailers (including dealers).[1] *See generally* Ind. Code tit. 7.1. In short, licensed producers (first tier) may sell only to licensed wholesalers (second tier), who may sell only to licensed retailers (third tier), who then may sell only to eligible consumers. Bedwell Decl., ECF No. 81-5 at 4. And with limited exceptions, no one holding a license for one of these three tiers may hold an interest in a license for any other tier. *See* Ind. Code §§ 7.1-5-9-2, 7.1-5-9-4, 7.1-5-9-6 to -10.

This three-tier system, which the United States Supreme Court has declared "'unquestionably legitimate,'" *Granholm v. Heald*, 544 U.S. 460, 489 (2005) (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)), is perhaps the

---

[1] Retailers are businesses that sell alcohol for consumption on the premises, such as restaurants and bars. *See* Ind. Code §§ 7.1-3-4-1 (beer retailer), 7.1-3-9-1 (liquor retailer), 7.1-3-14-1 (wine retailer). Dealers are businesses that sell alcohol for consumption off the premises, such as liquor stores, grocery stores, and convenience stores. *See* Ind. Code §§ 7.1-3-5-1 (beer dealer), 7.1-3-10-1 (liquor dealer), 7.1-3-15-1 (wine dealer).

fundamental—but by no means only—way that Indiana controls the flow and taxation of alcohol by limiting market participation. This case concerns an integral feature of that system in Indiana: precluding *any* wholesaler from holding an interest in a license for both liquor and beer distribution.

## I.    The Wholesale Tier and Prohibited-Interest Laws

Critical to the three-tier system, and the overall regulation of alcohol within Indiana, is the wholesale tier. This middle tier (that is, between the producer tier and the retailer tier) is the gatekeeper for virtually all alcohol importation and distribution within Indiana. *See* Bedwell Decl., ECF No. 81-5 at 4. It is the only tier that interacts directly with the other two tiers—its licensees buy directly from producers and sell directly to retailers. *See id.* The wholesaler tier ensures that alcohol is properly imported into Indiana and is properly distributed within Indiana to licensed dealer and retailer outlets. Terry Dep., ECF No. 81-1 at 147. As explained by Monarch's CEO, "[t]he purpose of the wholesaler/distributor [tier] . . . is, one, to be a port of entry for alcoholic beverages into a state. To pay the excise taxes. To limit the distribution of alcohol to only state-license retailers and dealers. And to provide independence among manufacturers, wholesalers and retailers." *Id.*

To distribute or wholesale alcohol in Indiana, one must acquire a permit issued specifically for that limited activity by the Indiana Alcohol and Tobacco Commission ("the Commission"). *See* Ind. Code §§ 7.1-3-3-1 (beer), 7.1-3-8-1 (liquor), 7.1-3-13-1 (wine). Indiana authorizes the distribution of alcohol by type

(*i.e.*, beer, wine, liquor) and requires a separate permit to distribute each type of alcohol. *Id.*

Critically for this case, however, no one may legally hold or have an interest in both a beer wholesaler's permit and a liquor wholesaler's permit (though both liquor and beer wholesalers may also wholesale wine). *See* Ind. Code §§ 7.1-3-3-19 (prohibiting the issuance of a beer wholesaler's permit to a person who holds a liquor wholesaler's permit), 7.1-3-13-1 (allowing the issuance of a wine wholesaler's permit to a person who holds either a beer wholesaler's permit *or* a liquor wholesaler's permit), 7.1-5-9-3 (declaring it unlawful for the holder of a beer wholesaler's permit to have an interest in a liquor wholesaler's permit), 7.1-5-9-6 (declaring it unlawful for the holder of a liquor wholesaler's permit to have an interest in a beer wholesaler's permit). Collectively, these restrictions are referred to as the "prohibited-interest" laws.

## II.   Monarch Beverage Company

Appellant Monarch Beverage Company, Inc. was incorporated and began its operations in 1947. Terry Dep., ECF No. 81-1 at 13. Monarch is a wholesaler of alcohol in Indiana and currently possesses permits from the State of Indiana to distribute both beer and wine. *Id.* at 23–24. Monarch has distributed beer since its incorporation in 1947 and has distributed wine since 1976. *Id.* at 24–25, 37–38.

The prohibited-interest laws Monarch challenges in this lawsuit were in effect at the time Monarch entered the market in 1947. *Id.* at 126. Monarch has grown considerably since that time. It has increased its number of employees and

currently employs approximately 300 people. *Id.* at 38. Monarch has also increased its warehouse space from about 50,000 square feet to 500,000 square feet and has added more delivery vehicles to its fleet. *Id.* at 64–68, 70–72.

During this time, Monarch has also expanded its presence within the market. Today, Monarch distributes wine in all 92 of Indiana's counties and beer in 89 counties. *Id.* at 55–60; Terry Dep. Ex. 2, ECF No. 81-7. It is the exclusive distributor of MillerCoors, maker of one of the most popular beers in Indiana, in approximately 70 Indiana counties. Terry Dep., ECF No. 81-1 at 60–63; Terry Dep. Ex. 2, ECF No. 81-7. And it distributes Gallo wine products in approximately 69 Indiana counties. Terry Dep., ECF No. 81-1 at 59–60; Terry Dep. Ex. 2, ECF No. 81-7. Monarch would like "to distribute the full line of products manufactured and sold in Indiana by the Gallo Winery and all its existing suppliers[,]" including its liquor products. Terry Dep., ECF No. 81-1 at 99. The prohibited-interest laws bar Monarch from distributing Gallo's liquor products. *See id.*

With respect to beer distribution, "most, if not all" of the relationships between Monarch and its beer suppliers are governed by written contracts. *Id.* at 47. Monarch's CEO testified that "most" of these contracts contain provisions requiring suppliers to repurchase products sold to Monarch if the supplier terminates the contract. *Id.* at 41–46, 52. He also stated that some contracts may contain clauses providing Monarch with additional compensation if the supplier terminates. *Id.* at 41.

In addition to these contractual protections of its business, Monarch—like all beer wholesalers—also enjoys statutory franchise protections. For example, when a beer supplier acquires the rights to a particular brand of beer from another supplier, the new supplier cannot transfer the distribution rights to a new wholesaler unless the new wholesaler compensates the existing wholesaler for the fair market value of the existing wholesaler's right to distribute the beer. Ind. Code §§ 7.1-3-25-7 to -9, -13; *see also* Ind. Code § 7.1-3-25-4.5(b) (providing that if the brand is 15% or more of the existing beer wholesaler's sales for the preceding 12 months, the existing wholesaler has the unconditioned right to keep distributing the brand regardless of a switch in suppliers). Thus, a beer wholesaler that loses an account because of a transfer of rights in the supply tier will be protected from bearing the financial burden of the transfer.

An additional franchise protection is found in Indiana Code § 7.1-5-5-9(c), which makes it "unlawful" for a beer supplier to terminate an agreement or contract with a beer wholesaler "without due regard for the equities of the [wholesaler]." A supplier who knowingly or intentionally violates this provision commits a Class B misdemeanor. Ind. Code § 7.1-5-5-9(d). The Indiana Court of Appeals has held that this provision applies even where the existing beer wholesaler has breached the terms of the distribution agreement. *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 579 N.E.2d 626, 636 (Ind. Ct. App. 1991) ("[A] brewer may not escape scrutiny under our termination statute . . . merely by asserting that the distributor committed a minor or technical breach of one of the provisions of the

agreement."), *rev'd in part on other grounds by Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975 (Ind. 1993).

Monarch's primary operational costs include the cost of buying alcohol from producers, payment of state excise taxes, payment of employee salaries and benefits, the cost of transporting alcohol to dealers and retailers, equipment purchase and maintenance, and interest payments. Terry Dep., ECF No. 81-1 at 79. These costs are factored into the prices Monarch charges its dealer/retailer customers. *Id.* at 80. Indiana law sets neither floors nor ceilings on the prices wholesalers may charge. *Id.* at 116–17. Wholesalers may sell below cost if doing so makes business sense. *Id.*

## III. Procedural History

On October 21, 2013, Monarch filed a complaint in the Southern District of Indiana alleging that the prohibited-interest statutes (Indiana Code §§ 7.1-3-3-19, 7.1-5-9-3, 7.1-5-9-4, and 7.1-5-9-6) violate the Equal Protection Clause of the Fourteenth Amendment. App. 36. The parties took discovery and filed cross-motions for summary judgment. *See* ECF Nos. 79, 93. Monarch argued that the challenged statutes "discriminate[] on [their] face against beer wholesalers, prohibiting them from seeking a permit to distribute liquor while affording the same privilege to any person or entity that does not have that characteristic." Pl.'s Summ. J. Mem., ECF No. 94 at 15–16. This restraint, Monarch argued, is not rationally related to any legitimate state interest. *Id.* at 16, 21–33. The State argued that the prohibited-interest laws do not violate the Equal Protection Clause

because the restriction on joint wholesaling of beer and liquor applies equally to all alcohol wholesalers and is rationally related to the legitimate public purposes underlying Indiana's regulation of the alcoholic beverage industry. Defs.' Summ. J. Mem., ECF No. 80 at 23–35.

On September 30, 2015, the district court granted the State's motion for summary judgment and denied Monarch's cross-motion for summary judgment. App. 18. The court held that Monarch failed to clear its "first hurdle[, which] is to show that it was treated disparately from a similarly situated entity or group." *Id.* at 8. Having failed to identify a "similarly situated comparator," *id.* at 8–9, Monarch's equal protection challenge could not succeed. "In ignoring the comparability issue," the district court stated, "Monarch fail[ed] to prove an 'essential' element of its claim." *Id.* at 9 (quoting *Harvey v. Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011)).

Even had Monarch proven this element, however, the district court held that Monarch's equal protection claim could not succeed because the State "articulated more than one legitimate state interest to which the challenged provisions rationally relate." *Id.* at 13. "[F]or one," said the court, "Indiana restricts beer wholesalers from obtaining liquor permits in order to maintain certain minimum prices for alcoholic products, reasoning that increased competition from beer wholesalers could depress liquor prices, leading to increased liquor consumption, addiction, and other societal ills." *Id.* at 14. In addition, the court acknowledged that the prohibition on joint permit holding could "result[] in a higher overall

number of wholesalers in Indiana," which, in turn, generates tax revenue for the State and increases the number of industry "watchdogs" who report violations to the Alcohol and Tobacco Commission. *Id.* at 16–17.

The court stressed that for purposes of its judicial inquiry, it matters not whether Indiana chose "the best way" to achieve its public policy ends or whether the interests articulated by the State accurately reflect the legislature's actual motivations for enacting the law. *Id.* at 14–18. Rather, "under a rational basis review, the government's reasons prevail even if they are based only on 'rational speculation unsupported by evidence or empirical data[.]'" *Id.* at 17 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). Thus, said the court, as Monarch "failed to eliminate 'any reasonably conceivable state of facts that could provide a rational basis for the [General Assembly's] classification . . . Defendants are entitled to summary judgment." *Id.* at 18 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

## SUMMARY OF THE ARGUMENT

Monarch seeks substantive economic constitutional rights under the guise of "equal protection." It does not protest any preferential legislative treatment for liquor distributors (or anyone else), but only the very fact that distinct types of alcohol distributors—for beer and liquor—exist under the law at all. A party challenging a legislative classification on equal protection grounds must establish that the regulatory scheme treats it "differently than others similarly situated and the difference is not rationally related to a legitimate state interest." *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir.

2015) (citing *Strail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009)). Here, because (as Monarch itself says) Indiana imposes "symmetric restriction[s]" on liquor and beer wholesalers, Appellant's Br. at 6, there is no disparate treatment to scrutinize. There are not even any similarly situated classes. There is simply the statutory requirement that distinct entities, owned by different persons, act as liquor and beer distributors. Whether that barrier is valid is at most a matter of whether a person qualified to distribute alcohol has a substantive constitutional right to distribute both beer and liquor (the answer to which, of course, is no). It is manifestly *not* a matter of supposedly preferential treatment for one person over another, or even one type of distributor over another.

Nor can Monarch evade the requirement that it identify a similarly situated class by casting its claim as a facial challenge to an express statutory classification. Again, no such classification exists. And even if one did, *all* equal protection claims—whether brought by a class of one against selective enforcement of a statute or by a class of many against express statutory classifications—are subject to the requirement that the challenger identify a similarly situated class receiving preferential treatment. Without such a "comparator," Monarch's claim is nothing more than a demand for substantive rights. For this reason alone, Monarch's only claim in this case—a claim for equal protection under the Fourteenth Amendment— must be summarily rejected.

What is more, to the extent equal protection implications arise from the legislature's bare creation of an impermeable barrier between beer distributors and

liquor distributors (membership in either of which group may be freely chosen), that creation is supported by legitimate and substantial government objectives. Specifically, the beer-liquor distinction is reasonably related to the legislature's desire to prevent a return to the "tied houses" model of alcohol distribution which merged the interests of retailers, wholesalers, and manufacturers into a single conglomerate at the ultimate expense of the local communities. In an effort to abolish tied houses and the societal ills they cause, state legislators in the post-Prohibition era erected barriers between liquor and beer interests at every level. These barriers—of which the prohibited-interest laws are just one example—recognize the inherent differences between beer and liquor, most particularly the significantly higher alcohol content of the latter, and limit the economic power of large alcoholic beverage concerns by restricting horizontal integration across product lines. As the district court held, this restriction is rationally related to the State's goals of maintaining high prices for liquor (in the interest of promoting temperance) and a robust wholesaler market with plenty of industry watchdogs. App. 14–17.

Monarch's counter-narrative that the beer-liquor barrier was enacted to serve the narrow political ends of various political operators is simply irrelevant. Federal constitutional doctrine does not permit courts to look behind statutory text to legislators' motivations, let alone to infer *bad* motives when the text of the statute itself is silent as to the legislature's intent. Rather, "a statutory classification comes to court bearing a strong presumption of validity, and the challenger must negative

every conceivable basis which might support it." *Ind. Petroleum Marketers*, 808 F.3d at 322 (quotations and citation omitted). And even if Monarch's counter-narrative is accurate, it demonstrates nothing more than politics as usual and, in any event, would not represent an indictment of the prohibited-interest laws in particular as so much as the entire three-tier regulatory system. That is simply too much weight to put on the patronage worries of a few Depression-era newspaper editors.

Moreover, the statutory franchise protections that Monarch and other beer distributors enjoy, but that do not exist for liquor distributors, constitute a separate legitimate basis for maintaining the prohibited-interest statutes. The existence of those protections means that, were the Court to invalidate the prohibited-interest statutes, incumbent beer wholesalers would benefit from a severely tilted playing field vis-à-vis incumbent liquor wholesalers. In particular, beer wholesalers such as Monarch would be able to compete freely for liquor suppliers, while liquor wholesalers would not be able to compete for beer suppliers without first paying off Monarch and its fellow incumbents. The legislature is entitled to avoid the market upheaval and uneven bargaining power that would likely result from repealing the prohibited-interest statutes.

## ARGUMENT

### I. Monarch Has No Equal Protection Claim Because the Prohibited-Interest Laws Treat *All* Wholesalers of Alcohol Equally

Indiana law treats all persons and all wholesalers exactly the same when it precludes holding an interest in the three types of wholesaler permits available in

Indiana—beer, liquor, and wine. *No one* may hold an interest in both a beer and a liquor permit. A beer wholesaler may also obtain a wine permit, but not a liquor permit; a liquor wholesaler may also obtain a wine permit, but not a beer permit. Ind. Code §§ 7.1-3-3-19, 7.1-3-13-1, 7.1-5-9-4. This identical legislative treatment—which achieves equality both as a matter of statutory text and regulatory impact—completely dooms Monarch's case, which has nothing to do with seeking equal treatment and everything to do with pursuing substantive economic rights that have no grounding in the Constitution.

## A. Monarch has identified no similarly situated class that receives preferential treatment under the prohibited-interest laws

As this Court very recently recognized, prevailing on an equal protection claim under rational-basis review "is a heavy legal lift for the challengers" of the statute. *Ind. Petroleum Marketers*, 808 F.3d at 322. To carry its burden, Monarch must establish that the challenged regulatory scheme "treats it[] . . . differently than others similarly situated and the difference in treatment is not rationally related to a legitimate state interest." *Id.* (citing *Strail*, 588 F.3d at 943).

At this point, five state and federal judges have evaluated Monarch's unequal treatment claims and *all five* have concluded there is no unequal treatment to review. The district court, of course, held that Monarch has identified no similarly situated class that receives preferential treatment under the prohibited-interest laws. App. 8 ("Monarch has entirely failed to identify [a similarly situated] comparator"). Before that, a Marion County trial judge held that the prohibited-interest laws do not impose unequal treatment because "[a]t the time of election of

13

which wholesaler to be, beer or liquor, the wholesalers stand equal." *Id.* at 50. And a three-judge panel of the Indiana Court of Appeals observed that "all persons who seek to obtain a wholesalers permit from the Commission are treated *equally* and have an *equal* opportunity to choose to become either a beer wholesaler or a liquor wholesaler, and after a choice has been made, beer and liquor wholesalers are *equally* prohibited from acquiring a permit to distribute any other alcohol except for wine." *Monarch Beverage Co. v. Cook*, No. 49A02-1504-PL-245, 2015 WL 9197720 at *6 (Ind. Ct. App. Dec. 17, 2015). Concluded that court: "There can be no Equal Privileges and Immunities claim where all classes of persons are treated equally." *Id.*

Nevertheless, Monarch continues to insist that the prohibited-interest laws laws "create[] two classes of persons: beer wholesalers (who may not obtain a liquor wholesaler's permit), and everyone else (who may)." App. 26; Appellant's Br. 23. But this formulation of the issue does not describe "classes" that are treated differently by the prohibited-interest laws so much as the basic choice the laws put to *every* person: What kind of wholesaler do you want to be?

It is important to bear in mind that the prohibited-interest statutes regulate not wholesalers as such, but "persons." *See* Ind. Code § 7.1-3-3-19 ("The commission may not issue a beer wholesaler's permit to a *person* who holds a wine wholesaler's permit and a liquor wholesaler's permit.") (emphasis added); Ind. Code § 7.1-5-9-3 ("It is unlawful for the holder of a brewer's or beer wholesaler's permit to have an interest in a liquor permit of any type under this title . . . [and a] *person* who

knowingly or intentionally violates this section commits a Class B misdemeanor.") (emphasis added); Ind. Code § 7.1-5-9-4 ("Except as provided in IC 7-1-3-3-4, an applicant for a beer wholesaler's permit shall have no interest in . . . [a]ny other permit to wholesale alcoholic beverages . . . [and a] *person* who knowingly or intentionally violates this section commits a Class B misdemeanor.") (emphasis added); Ind. Code § 7.1-5-9-6 ("It is unlawful for the holder of a . . . liquor wholesaler's permit to have an interest in a beer permit of any type under this title . . . [and a] *person* who knowingly or intentionally violates this section commits a Class B misdemeanor.") (emphasis added). Each "person" who would become an alcohol wholesaler comes to the Commission with the *same* basic choice: beer or liquor. At the point where license applicants must make a choice, they are treated equally.

If, however, Monarch is arguing that the law imposes discriminatory treatment *after* the regulated "persons" make their choices between beer and liquor, such an assertion is inaccurate. Beer and liquor wholesalers are *equally* precluded from acquiring permits to distribute any other alcohol except wine (and wine wholesalers may equally choose also to distribute liquor or beer, but not both). Indeed, Monarch concedes that Indiana imposes a "symmetric restriction on liquor wholesalers: liquor wholesalers may not obtain a permit to wholesale beer." Appellant's Br. 6. (In State court, Monarch described the prohibited-interest laws as "deny[ing] to anyone holding a beer wholesaler's permit the privilege of holding a liquor wholesaler's permit, *and vice versa*, while affording that opportunity to

everyone else." *Monarch Beverage Co.*, 2015 WL 9197720 at *6 (emphasis added)). Thus, Monarch complains *only* about the law's insistence that two separate types of alcohol wholesalers—liquor and beer—actually exist; it asserts no material differential treatment between the two.

Moreover, the "symmetric" consequences that follow from a person's choice to be either a beer or liquor wholesaler are part of the entire limited-market-system structure, which is designed to restrict the size, scope, reach, and influence of each participant. Indiana has deliberately segmented the marketplace both vertically (recall the three tiers) and horizontally (requiring separation of liquor and beer wholesalers). The required separation of liquor and beer wholesalers into separate economic interests no more constitutes unequal treatment than the vertical separation of wholesale and retail interests. Under Monarch's theory, it could also claim unequal treatment under the law because it chose to become a beer *wholesaler* and is thereby precluded from acquiring an interest in a beer *retailer's* permit. *See* Ind. Code § 7.1-5-9-9.

Attacks on these market segmentations are nothing more than substantive complaints about structured markets, not complaints about preferential treatment. There is no basis for asserting that a liquor wholesaler is treated preferentially to a beer wholesaler (or vice versa), or that a wholesaler is treated preferentially to a retailer (or vice versa). Each is equally restricted to its chosen segment within the alcohol distribution market. A person cannot, after making a choice to wholesale beer knowing the consequences that follow therefrom, complain of unequal

treatment compared with those who made a different choice within the same system of limited permits (or those who have made no choice at all).

In *Corbitt v. New Jersey*, 439 U.S. 212 (1978), the Court rejected the idea that a predicate inequality can arise from the very consequences that define equally available choices. There, the State permitted reduced sentences for defendants who plead guilty but not for those convicted at trial. Addressing the theory that defendants convicted at trial were treated unequally compared with those who plead guilty, the Court said that to force such situations "into an equal protection framework is a task too Procrustean to be rationally accomplished." *Id.* at 225. With each choice, "the defendant faces a multitude of possible outcomes and freely makes his choice. Equal protection does not free those who made a bad assessment of risks or a bad choice from the consequences of their decision." *Id.* at 226. As in this case, Corbitt's complaint had less to do with "unequal" consequences of a choice than with being forced to make the choice at all. *See id.*

It is critical to recognize the distinction between a law's creation of groups that everyone generally has an equal right to choose between (such as beer and liquor wholesalers), and a law's ancillary disparate treatment of those freely chosen classes (such as, say, different labor laws for beer and liquor wholesalers). Equal protection doctrine concerns itself with imposition of different ancillary rights and obligations on different classes (membership in which may occur either voluntarily or involuntarily), such as different retirement-age requirements for different types of government employees, *Vance v. Bradley*, 440 U.S. 93 (1979) (*see also Trafelet v.*

*Thompson*, 594 F.2d 623, 627 (7th Cir. 1979)), different tax bases for new and existing property owners, *Nordlinger v. Hahn,* 505 U.S. 1, 11 (1992), different sales restrictions for package liquor stores versus other stores, *Ind. Petroleum Marketers*, 808 F.3d at 324–25, different collective bargaining rights for public safety employees compared with other government employees, *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 644–46 (7th Cir. 2013), and different punishments for crack and powder cocaine dealers, *United States v. Moore*, 644 F.3d 553, 555 (7th Cir. 2011).

Monarch's claim has nothing to do with ancillary consequences attaching to its membership in the "class" of beer wholesalers. It is not complaining, for example, that beer wholesalers and liquor wholesalers are unconstitutionally subjected to different regulations of ownership interests, prices, aggregate sales, territorial size, or even license allocation. It does not even claim that the laws shunt some persons into liquor wholesaling and others into beer wholesaling.

In this regard, Monarch's claim does not resemble its absurd hypothetical scenarios where fishermen cannot be drivers, cosmetologists cannot be foster parents, and welfare recipients cannot be students at state colleges. Appellant's Br. at 31. In each of these examples, the members of the mistreated classes (*i.e.*, the first of each pairing) are not *defined* by the differential treatment, but exist *independent* of it. Their rights compare unfavorably with others who also exist independent of the ancillary differential treatment. For example, licensed fishermen and non-fishermen both exist independent of licensed drivers, but in the

hypothetical, only non-fishermen can become licensed drivers. That is unequal treatment as it relates to a subject ancillary to the existence of licensed fishermen and non-fishermen. Here, the classes of beer and liquor distributors exist only in relation to one another as parts of an integrated regulatory scheme with goals that can be achieved only by the separate existence of each.

The better analogy is to the system that divides the world between those who hold a fishing license and those who do not for purposes of restricting who may fish. If a fishing license is generally available to all, it makes no sense to think of laws barring non-licensees from fishing as imposing "unequal" treatment. There is no "everyone else" enjoying greater rights, as, generally speaking, all may avail themselves of the same basic choice required by the scheme.

What Monarch really complains about is the antecedent choice it must make between liquor and beer wholesaling. It essentially argues that "persons" regulated by the prohibited-interest statutes should not be put to the choice between liquor and beer *at all*. It makes, at bottom, a claim that all (otherwise qualified) persons must have the right to be *both* beer wholesalers *and* liquor wholesalers. This is a claim for substantive economic rights, not equal protection. "The guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980).

It is understandable, of course, why Monarch would not expressly articulate these objections as substantive rights claims. Not since the *Lochner* era have

federal courts looked favorably on claims of economic rights. *See Matter of Gifford*, 688 F.2d 447, 453 (7th Cir. 1982) ("[I]t is now well established that economic regulation will be sustained against substantive due process challenges provided the regulation has a rational basis."). Indeed, this Court has consistently rejected substantive constitutional rights concerning alcohol. *See, e.g., Frey Corp. v City of Peoria*, 735 F.3d 505, 511 (7th Cir. 2013) (holding that site approval for retail sale of alcohol is not a protected property right under the Due Process Clause); *Bayview-Lofberg's Inc. v. City of Milwaukee*, 905 F.2d 142, 145–46 (7th Cir. 1990) (holding that a local ordinance and state statutes did not create a constitutionally protected property interest in the possession of a liquor license after the applicants had done no more than file their completed applications); *Polenz v. Parrott*, 883 F.2d 551, 555–56 (7th Cir. 1989) (holding applicants did not have a constitutionally protected property or liberty interest in the issuance of a tavern license).

Yet the tenor of Monarch's economic theory arguments betray its real demands. It argues, for example, that "market realities" cast the State's economic theories into doubt, and that "the notion that beer wholesalers could maintain artificially inflated beer prices in order to lower their prices on liquor is pure 'fantasy.'" Appellant's Br. 43, 47. It even says things like, "[p]ermitting beer wholesalers to enter the liquor market to compete with such entrenched incumbents is likely to disrupt oligopolistic conditions, not to create them." *Id.* at 45. But as Justice Holmes warned in *Lochner*, the Constitution does not safeguard anyone's preferred understanding of regulatory economics. *Lochner v. New York*, 198 U.S.

45, 75–76 (1905) (Holmes, J., dissenting) ("[A] Constitution is not intended to embody a particular economic theory . . . . [T]he accident of our finding certain [economic] opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.").

Monarch cannot save the day by recasting its substantive economic rights claim as a demand for equal treatment. *See Gosnell v. City of Troy, Ill.*, 59 F.3d 654, 657 (7th Cir. 1995) (explaining that the "theme" of plaintiff's argument is substantive due process, which "is not just embattled; it has been vanquished"); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130 (7th Cir. 1995) (rejecting plaintiff's interest in "obtaining the maximum return on investment," which "is not a 'fundamental' right. The right of bakers to work for long hours, and thus to earn money . . . is far more important to personal liberty, yet the days of *Lochner v. New York,* 198 U.S. 45 (1905), have passed.").

\*\*\*

Essentially, Monarch is positing the non-sequitur that beer and liquor wholesalers are treated unequally because they cannot become one another. They are in fact treated exactly the same (as are all regulated "persons" who make the choice to be one or the other in the first instance), which leaves Monarch to hang its case on the bare notion that the very existence of "beer" and "liquor" wholesalers is itself an inequality. Yet they point to no cases where a legislative decision to divide

markets in this way has been invalidated on grounds of unequal treatment, and for good reason: It is a matter of substantive rights at most, not a matter of inequality.

**B.**   **Monarch cannot cast its claim in any way that will allow it to evade the "similarly situated" requirement**

Unable to identify any similarly situated class created and favored by the law, Monarch instead attempts to write this requirement out of the equal protection analysis altogether.  Monarch claims that because it is raising a facial challenge to an "express statutory classification," it need not identify any similarly situated class that receives preferential treatment under the prohibited-interest laws.  Appellant's Br. 24.   That requirement, Monarch contends, is limited to "class-of-one" or "selective-enforcement" claims.  This argument cannot succeed.

1.   First, Monarch's distinction between class-of-one claims and express statutory classification claims is merely an exercise in formalism, as the "similarly situated" requirement is an essential component of *all* equal protection claims. Whether described as a "threshold" requirement, *see* Appellant's Br. 17, or a step in the equal protection analysis, the bottom line is the same:  A claimant cannot prove an equal protection violation without showing unequal treatment of similarly situated classes.  Absent such a showing, the claimant has not raised an equal protection claim at all but, rather, a claim for substantive rights.  *See* Part I.A., *supra*.

As this Court has explained, "[a]ll equal protection claims, regardless of the size of the disadvantaged class, are based on the principle that, *under 'like circumstances and conditions,'* people must be treated alike, unless there is a

rational reason for treating them differently." *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) (emphasis added) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601–02 (2008)).

The "express statutory classification" cases Monarch cites follow this same basic framework. *See* Appellant's Br. 24. For example, in a challenge to Indiana's law prohibiting grocery and convenience stores from selling cold packaged beer, this Court stated that the plaintiff had to "establish that Indiana's cold-beer regulatory scheme treats its members differently than others similarly situated . . . ." *Ind. Petroleum Marketers*, 808 F.3d at 322. Here, Monarch makes no effort to show how "everyone else" (the supposed class allegedly receiving preferential treatment) is "similarly situated" to it.

This Court's decision in *Goodpaster v. City of Indianapolis*, 736 F.3d 1060 (7th Cir. 2013), is particularly instructive on this point. There, traditional bar owners asserted both (substantive) due process and equal protection objections to an ordinance prohibiting smoking in their bars but not in cigar bars. After rejecting the due process claim that the city could not preclude smoking in bars at all, this Court said of the equal protection claim: "[T]he analysis is slightly different than for the due process claim discussed above. Rather than identify a rational reason for infringing on citizens' ability to smoke in public, we must identify a rational reason for the distinction the ordinance draws between traditional bars and tobacco specialty bars." *Id.* at 1071. In contrast with *Goodpaster*, there is no predicate inequality here because the question Monarch poses—whether a valid basis exists

23

for precluding beer distributors from also distributing liquor, and vice-versa—is *no different* from the question that would have arisen from a due process claim, had Monarch chosen to bring one.

The *Walker* right-to-work case demonstrates the same point. There, this Court observed that "Wisconsin was free to impose any of Act 10's restrictions on all unions. . . . The Unions instead challenge as irrational the division of public safety and general employees under the Equal Protection Clause." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013). Here, Monarch cannot similarly distinguish between a substantive objection to the prohibited-interest statutes and its re-cast "equal protection" objection to them. There is no "division" among players who would otherwise exist, only an integrated regulatory scheme that calls forth those players in the first instance.

Monarch's argument that, in cases of express statutory classifications, "the question of whether the plaintiff is being treated differently from someone else who is 'similarly situated' necessarily collapses into the substantive equal-protection inquiry," Appellant's Br. 25, simply begs the question: Who is similarly situated? Monarch has no answer to this question, and its equal protection claim must therefore fail. *See* App. 8 ("Monarch has entirely failed to identify any . . . comparator. We don't know if it intends to show that its treatment was unequal compared to other Tier 2 wholesalers or to other Tier 1 and 3 suppliers of alcohol to Indiana consumers."); *Monarch Beverage Co.*, 2015 WL 9197720, at * 6

("Monarch does not identify any similarly situated class that receives preferential treatment under the Prohibited Interest Provisions.").

2.     Even if there is some analytical distinction between class-of-one claims and challenges to facial classifications, it is irrelevant here as Monarch's claim—to the extent it can even be categorized as an equal protection claim at all—in many ways actually resembles a class-of-one claim.  To the extent the district court treated it as such and required Monarch to identify a similarly-situated comparator, doing so was a logical response to Monarch's indeterminate description of the "classes" allegedly created by the prohibited-interest laws.

Again, Monarch claims that those laws create "two classes of persons:  beer wholesalers (who may not obtain a liquor wholesaler's permit), and everyone else (who may)."  App. 26; Appellant's Br. 23.  The Court has treated this type of claim—*i.e.*, Class A versus "everyone else"—as a class-of-one claim.  In *Flying J Inc. v. City of New Haven*, this Court explained that "the classic example of irrational government action in a class of one equal protection case in this circuit is 'an ordinance saying:  'No one whose last name begins with 'F' may use a portable sign in front of a 24-hour food shop, but everyone else may.'"  549 F.3d 538, 547 (7th Cir. 2008) (citing *Falls v. Town of Dyer*, 875 F.2d 146, 147 (7th Cir. 1989)).  Aside from the manifest arbitrariness of that example, Monarch has formulated its challenge in exactly this manner:  beer distributors versus "everyone else."

Nonetheless, Monarch asserts that its claim "is decidedly not a 'class of one' claim," Appellant's Br. 23, but does not explain why this is so, leaving one to infer

that Monarch is interpreting the phrase "class of one" literally to preclude any classes containing more than one claimant. But the Court's example in *Flying J* repudiates such a narrow reading, as the class of individuals with a last name beginning with 'F' surely contains more than one person. Indeed, the Supreme Court has addressed this very issue, permitting a class-of-one equal protection theory to proceed even though the class may have included as many as five. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 n.1 (2000). Notably, said the Court, "[w]hether the complaint alleges a class of one or of five is of no consequence because we conclude that the number of individuals in a class is immaterial for equal protection analysis." *Id.* To be sure, such a statement might be taken to erase any analytical distinction between class-of-one claims and other equal protection claims, but if so that would only underscore the need to find a "comparator" in *all* equal protection claims.

Regardless, based on *Flying J* and *Village of Willowbrook*, Monarch's claim fits the class-of-one framework, which fully justifies, even by Monarch's standards, the district court's reliance on class-of-one cases to reject Monarch's "us against the world" theory.

## II. The Prohibited-Interest Laws Are Justified by the General Post-Prohibition Policy of Limiting the Size, Scale, and Influence of Large Alcoholic Beverage Companies

Even if Monarch somehow states a claim for disparate treatment by protesting the mere existence of beer and liquor wholesalers as mutually exclusive but freely chosen groups, its equal protection claim must fail because, as the district

26

court held, the State "ha[s] articulated more than one legitimate state interest to which the challenged provisions rationally relate." App. 13. "For one," said the court, "Indiana restricts beer wholesalers from obtaining liquor permits in order to maintain certain minimum prices for alcoholic products, reasoning that increased competition from beer wholesalers could depress liquor prices, leading to increased liquor consumption, addition, and other social ills." *Id.* at 14. In addition, the district court recognized that the prohibited-interest laws "result[] in a higher overall number of wholesalers in Indiana, given that beer wholesalers would otherwise have the power to eliminate the current liquor wholesalers, if they were allowed to enter the liquor market." *Id.* at 16. This, in turn, leads to more "warehouses, trucks, employers, and employees, all of which generate tax revenue" as well as a greater "number of industry 'watchdogs' who report violations to the [ATC.]" *Id.* at 17.

A statutory classification "must be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns, Inc.*, 508 U.S. at 313 (emphasis added). Monarch's arguments are insufficient to negate these or any other justifications for the prohibited-interest laws.

A.    **States have long regulated beer and liquor differently owing to different economic and social consequences; segmenting wholesalers addresses those differences and promotes temperance-related goals**

The prohibited-interest laws maintain restrictions long embedded in the law as one of many means intended to prevent the social ills that precipitated

Prohibition, namely tied houses and easy access to cheap hard liquor. *See* App. 14 (acknowledging state interest in maintaining certain minimum prices for liquor in order to promote temperance). In this respect, it is significant that liquor and beer are different beverages with different alcohol contents and historically have given rise to different concerns. Liquor, in particular, has long been subjected to stricter controls, as it contains significantly higher alcohol content than either wine or beer and causes more numerous and significant societal ills.

In 1933, liquor had a much higher alcohol content than beer and wine. Beer ranged from 3.0% to 6.3% alcohol by volume (ABV), with the most widely consumed German beer at 4.4%. Raymond Fosdick & Albert Scott, *Toward Liquor Control* 139, App. V (Ctr. For Alcohol Policy 2011) (1933). Wine generally ranted from 6.7% to 13.5% ABV, with the average California wine at 11.3%. *Id.* Liquors, however, often had ten times the alcohol content of the most common German beer. American whiskey featured 43% to 50% ABV, gin 40% to 47%, cognac 45%, and rum 55%. *Id.* Average alcohol content remains similar in the twenty-first century. In 2002, the average alcohol content of beer sold in the United States was 4.65% ABV. William C. Kerr et al., *Estimates of the Mean Alcohol Concentration of the Spirits, Wine, and Beer Sold in the United States and Per Capita Consumption: 1950 to 2002*, Alcoholism: Clinical and Experimental Research, vol. 30, issue 9, 1583, 1586 (Sept. 2006). Wine was 11.45%. *Id.* Liquor averaged 36.9% ABV nationally, and about 36.7% in Indiana. *Id.* at 1588, tbl. 1. Liquor's ABV has decreased since the 1930s, but remains about eight times greater than beer. *See id.*

To help ameliorate the negative social impacts of liquor's substantially greater potency, the legislature has at many points divided beer and liquor into separate regulatory tracks. The separation of liquor and beer at the wholesale level, for example, mirrors the separation of liquor and beer at the production level. *See* Ind. Code §§ 7.1-5-9-3 (prohibiting a beer producer from holding an interest in a liquor permit of any type), 7.1-5-9-6 (prohibiting a liquor producer from holding an interest in a beer permit of any type). The point is to help vindicate the general policy against so-called tied houses, one feature of which was unitary control over production and distribution of both beer and liquor. *See* Fosdick & Scott at 29. In short, if it is legitimate to separate beer and liquor at the production stage, then it is surely legitimate to maintain that separation at the distribution stage. To permit wholesalers to bring both beer and liquor under the same ownership interest at the distribution level would substantially vitiate, if not defeat entirely, the anti-tied house objective served by the barrier between beer and liquor producers.

Nor is Indiana alone in maintaining this barrier at the wholesale level. For while it may be technically accurate to say that Indiana is the only state that maintains a barrier between *private* beer and liquor wholesalers, Indiana is far from unique in maintaining the beer-liquor division at the wholesale level. The Rockefeller Commission urged states to monopolize themselves distribution of "stronger forms of alcohol," principally meaning liquor and wine rather than beer. Fosdick & Scott at 27–28, 41–60. Following that recommendation, seventeen states controlled wholesale distribution of "distilled spirits," but apparently permitted

private interests to wholesale beer. *See* Phillip J. Cook, *Paying the Tab: The Economics of Alcohol Policy* 28 (2007); Fosdick & Scott at 41–60. "In the 1970s, about one-third of U.S. states controlled alcohol distribution and sales through direct ownership of wholesale and through a full or partial ownership of retail." Roland Zullo et al., *The Fiscal and Social Effects of State Alcohol Control Systems*, University of Michigan (May 2013) at i, *available at* http://irlee.umich. edu/Publications/Docs/FiscalAndSocialEffectsOfStateAlcoholControlSystems.pdf.

Nowadays, many states still maintain wholesale monopolies over liquor but not beer. *See, e.g.*, Iowa Code Ann. § 123.22 (vesting state with exclusive control over alcoholic liquor sold by distilleries "except beer and wine"); *compare* Mich. Comp. Laws § 436.1203(6) (providing that only the state commission or its authorized agent may purchase and import "spirits") *with* §§ 436.1305 and 436.1403 (imposing restrictions on *private* wholesalers of wine and beer); *compare* Mont. Code Ann. § 16-3-101(2)(a)(ii) (requiring all liquor entering the state to be shipped "to the state liquor warehouse") *with* § 16-3-230 (requiring all beer entering the state to be shipped "to a licensed wholesaler"); *compare* Vt. Stat. Ann. tit. 7, § 63(a) (granting the state a monopoly on importation and transportation of liquor) *with* § 63(b) (providing for transportation of all malt or vinous beverages through licensed wholesalers); *compare* W. Va. Code Ann. § 60-3-1 ("[t]he sale of alcoholic liquors at wholesale and retail in this State is a state monopoly") *with* § 11-16-9 (establishing a licensing scheme for private beer wholesalers); *compare* Wyo. Stat. Ann. § 12-2-301(a) (making the state commission "the exclusive wholesaler distributor and

seller of alcoholic liquor") *with* § 12-2-201(a) (providing for a license for private wholesale of "malt beverages only").

In terms of precluding beer wholesalers from distributing liquor, there is no difference between these states and Indiana. So for eighty years Indiana has been in good company, which again reflects the general post-Prohibition concern that permitting market aggregation of all types of alcohol above the retail level leads to profound social ills.

**B.    The interest in preventing tied houses arises from post-Prohibition efforts to establish an orderly regulatory regime that would promote temperance and prevent a concentration of economic power and abuses of such power**

The history of alcohol regulation shows that the prohibited-interest laws, like other regulatory barriers between beer and liquor, were intended to promote temperance by preventing tied houses, maintaining higher prices through market inefficiencies, and by keeping any one wholesaler from obtaining too much power within the alcohol market. As even contemporary researchers have shown, "the terms on which alcoholic beverages are supplied to the public affect consumption, abuse, and consequences." Cook at 148. Moreover, proponents of deregulation examining the three-tier system "through a lens of pure economic theory miss the Fosdick and Scott (1933) proposition of intentional fractionalization using the middle tier as the monopoly" and buffer between large manufacturers and local retailers. Carole L. Jurkiewicz & Murphy Painter, *Social and Economic Control of Alcohol: The 21st Amendment in the 21st Century* 9 (2008).

1. During Prohibition, beer and wine were difficult to make and ship, but distilled liquor was easy to produce and thus became a more commonly-consumed beverage.  Harry G. Levine, *The Alcohol Problem in America: From Temperance to Alcoholism*, 79 British J. of Addiction 109, 114 (1984).  By some conservative estimates, liquor production increased by eighteen million gallons per year during Prohibition.  Sen. Millard E. Tydings, *Before and After Prohibition* 50–51 (1930); *see also Selected Articles on Prohibition of the Liquor Traffic* 5 and tbl. 4 (2d ed. 1917) (noting that as more states enacted state-level Prohibition, per-capital alcohol consumption actually *increased*).  Prohibition not only led to more liquor production; it also led to "bootlegging, racketeering and the whole wretched nexus of crime," which was often blamed on easier access to liquor.  Fosdick & Scott at 9.  Widespread "defiance of the law" and "demoralization in public and private life" eventually convinced even teetotalers that Prohibition needed to end.  *Id.*

In 1933, John D. Rockefeller—a teetotaler himself—commissioned a study published as Toward Liquor Control, which served as a blueprint for state regulation of alcohol after Prohibition.  Rockefeller described the impetus of the study (and its regulatory recommendations):  "[T]he regrettable failure of the Eighteenth amendment has demonstrated the fact that the majority of the people of this country are not yet ready for total abstinence, at least when it is attempted through legal coercion.  The next best thing—many people think it the better thing—is temperance."  Fosdick & Scott at xiii.

Americans remembered the dangers of merged alcohol interests and blamed pre-Prohibition intemperance on "tied houses," which were retail establishments (like saloons) subsidized and monopolized by distributors and manufacturers. *Id*. at 29. Tied houses merged the interests of retailers, wholesalers, and manufacturers into a single conglomerate by entering into exclusive contracts to buy all their alcohol from a particular distributor. *Id.* Distributors also exercised power over retailers by renting critical equipment to saloons or requiring lax liquor sale policies. Because distributors often lacked interests in local communities, they used their power over retailers to demand sales-maximizing policies, without regard for the well-being of the retailers' local communities. *Id.* The tied house system also produced "a large excess of sales outlets . . . [which] is a matter of crucial importance because of its effect in stimulating competition in the retail sale of alcoholic beverages." *Id.* With increased competition comes lower prices and, thus, more ready access to alcohol.

The Rockefeller study recommended abolishing tied houses "by all available means." *Id.*; *see also, e.g.*, Federal Alcohol Administration Act § 5(a), ch. 814, 49 Stat. 981 (1935) (banning "tied houses"). This included the recommendation that states maintain barriers between private liquor and beer interests at every level— producers, wholesalers, and retailers. *See* Fosdick & Scott at 29. It recommended that for purposes of legislative line drawing, "[a] natural and convenient division is between fermented beverages and distilled liquors," going so far as to say that "the experience and common sense of mankind have always recognized the difference

between the two . . . ." *Id.* at 20. Because liquor is far more intoxicating, "[t]his difference should be made the basis of a *radical difference in treatment under the law*." *Id.* (emphasis added).

The study urged, among other things, that "[l]icenses should be classified to recognize inherent differences between beer, wine and spirits as problems of control." *Id.* at 30. According to the study commission, "[o]ne of the most satisfactory license classifications in this country before prohibition was in Massachusetts, where seven kinds of licenses were provided," including separate licenses for beer (Class VI) and spirits (Class VIII) at each tier. *Id.* at 30–31. Said the commission, "we think it undesirable to combine Classes VI and VIII." *Id.* at 32. Indeed, "any state admitting VIII [spirits] is running the gravest kind of risk." *Id.*

2. Indiana legislators voiced similar concerns regarding merged alcohol interests. In 1932, the Republican state convention called for repealing Prohibition and enacting in its place laws to "promote temperance, effectively abolish the saloon, . . . and bring the liquor traffic itself under complete public supervision and control." Harold C. Feightner, *Wet and Dry Legislation in Indiana (1790–1957)* 261 (1957). This was echoed by the Democratic convention, which called for repeal and "the enactment of regulatory laws as will protect persons and property and prevent the return of the saloon." *Id.* Thus, when developing post-Prohibition solutions, many state legislatures, including Indiana's, approached beer as a separate regulatory problem from liquor.

In the immediate aftermath of Prohibition, Indiana enacted its 1933 control law, borrowing liberally from the suggestions proposed by the Rockefeller study. *Id.* at 276. The law pursued temperance by prohibiting "forever the open saloon" so "that the use of intoxicating liquor as a beverage may be limited and temperance encouraged." Feightner at 276; App. 725. The 1933 control law permitted broader sales of light beer and wine, but generally limited liquor sales to drug stores for medical purposes only. Feightner at 277–78. It also expressed a special concern for liquor wholesalers and placed special requirements on them. *See, e.g.*, App. 642 (requiring liquor wholesalers to reside in Indiana for more than three years before licensing and pay a tax on sales to retailers).

In 1935, Indiana enacted the Liquor Control Act, which established the three-tier licensing system that remains largely in effect today. Feightner at 280; ECF No. 95-6 at 455. The Rockefeller study again served as the foundation for the 1935 control law. Feightner at 280. Its preamble announced its goal of "prevent[ing] saloons" and safeguarding health, peace, and morals. *Id.* Under the new law, the State designated all wholesalers in the state and approved all retail licenses. "The moderate beverages like beer and wine were divided from their more potent brethren all the way down the line from manufacturer to retailer by requiring separate permits." *Id.* at 282. Beer and wine permits were liberalized, but retail liquor licenses were limited to one for every 1,000 persons in a town and banned in small towns without the consent of town leaders. *Id.*

Of special relevance here, the act also "forbid interlocking ownerships between liquor and beer interests [and] between manufacturer, wholesaler or retailer" in order to prevent pre-Prohibition abuses from returning. *Id.* at 283. The wholesale restrictions were "an effort to keep wholesalers from becoming too large and powerful." Marc Carmichael & Harold Feightner, *A History of Alcohol and Politics in Indiana* 28 (2012); *see also* Fosdick & Scott at 39 (warning of "the deep entrenchment of a far-flung proprietary interest" of large and powerful alcoholic beverages license holders with "a vested interest" and inclination "to employ aggressive tactics" to expand power and control over alcoholic beverages).

The 1935 control law centralized licensing power in the State "to insure uniform regulation instead of relying solely on what had often happened to be the political favoritism of the sheriffs, the mayors and the chiefs of police." Harold C. Feightner, *150 Years of Brewing in Indiana* 18.3 (1966). Beer wholesalers were limited to one license per county of 20,000 people or less. *Id.* at 18.5. Under that plan, forty-six counties had only one beer wholesaler. *Id.* Liquor wholesale licenses, however, were issued statewide according to a quota of one per 50,000, perhaps to ensure fewer liquor licenses overall (the better to decrease competition in order to maintain higher prices) or to account for initially weaker liquor license demand. *See* Carmichael & Feightner at 91.

Legislators supporting the law emphasized that the bill was not perfect, but supported it over past laws because it attempted to improve morals. Representative William Babcock of Jasper County explained, "God forbid we continue under the

present law. . . . It makes no difference to me who gets the profits on a sale of beer and liquor; what I am interested in is the improvement of morals in our great state." H.B. 399, Ind. H.R. Journal, 79th Reg. Sess., at 1221 (Ind. 1935). Representative Stanley S. Gilbert of St. Joseph County voiced a similar opinion: "I think that [the bill] is a great improvement over the old law. It not only provides for home rule and local control, but betters the morals of the community as well." *Id.*

3. Many facets of contemporary alcohol regulation at other tiers of the market reflect the long-term view that the causes of temperance and orderly markets require recognition of inherent differences between liquor and beer—and often tighter restrictions on production, distribution, and sale of the former. As noted above, at the commercial mass production level, a person who holds a license to distill liquor may not also hold a license to brew beer, and vice versa. Ind. Code §§ 7.1-5-9-3, -6.

Even at the retail level, where the law in some contexts enables consumers to find different types of alcohol at the same retail location, the law maintains a distinction between liquor and beer. First and foremost, grocery stores may obtain permits to sell beer and wine, but not liquor. Ind. Code §§ 7.1-3-5-2(a), -15-2. Liquor dealer permits are available only to package liquor stores (which may admit no one under the age of 21 and are restricted in what they may sell besides alcohol) and licensed pharmacists. Ind. Code §§ 7.1-3-10-2, -4, -5.

Next, while three-way permits are available to sell beer and liquor at retail for on-premises consumption, different qualifications apply to the beer and liquor components of such licenses.  Liquor retailer's permits are restricted according to the population of the applicant's locality.  Such a permit may be issued only for premises located in cities with populations of at least 5,000.  Ind. Code § 7.1-3-9-2.  If a city or town has a population of fewer than 5,000, its legislative body must enact an enabling ordinance consenting to the issuance of liquor retailer's permits to applicants located within the town.  Ind. Code § 7.1-3-9-3.  The legislature has placed no such local-control restrictions on beer and wine retailer permits.  *See generally* Ind. Code ch. 7.1-3-4 and 7.1-3-14.

Specialty liquor permits are also more restricted than specialty beer and wine permits.  For example, while the Commission may issue beer retailer's permits to the proprietors of race tracks meeting certain criteria, Ind. Code § 7.1-3-6-16, there is no such provision allowing the sale of liquor at race tracks.  *See generally* Ind. Code ch. 7.1-3-6.

Even with respect to non-commercial production, nothing in Title 7.1 prohibits individuals from making wine or beer in their homes for "[p]ersonal or family use" or "[u]se in the residence of the person who manufactures the wine or beer."  Ind. Code § 7.1-1-2-3(a)(4).  But there is no such allowance for at-home liquor manufacturing.  *Id.*; *see also* Ind. Code § 7.1-5-6-1(a) ("It is a Class C misdemeanor for a person to knowingly own, have in the person's possession or under the person's

control, or use a still or distilling apparatus for the manufacture of liquor, except as otherwise provided in this title.").

Finally, liquor is subject to a significantly higher excise tax than either wine or beer. Liquor is taxed at a rate 23 times higher than beer, $2.68 per gallon versus $0.115 per gallon, and wine is taxed at $0.47 per gallon. Ind. Code §§ 7.1-4-2-1, -3-1, -4-1.

Monarch argues that beer wholesalers are in some ways regulated more restrictively than liquor wholesalers in that they must make an initial investment in their business, may have only one warehouse, must occupy leased premises for the full term of their permit, and may hold only one permit. Appellant's Br. 48. It is unclear why Monarch mentions these particular distinctions, which presumably arise from concerns about market conditions among beer wholesalers that do not arise with liquor wholesalers. Regardless of the rationale, such differential treatment only underscores the point that liquor and beer are in many respects regulated separately to account for *various* differences, including not only potency but also market conditions.

4. In sum, the legal distinction between beer wholesalers and liquor wholesalers is not some thoughtless statutory aberration, let alone an arbitrary or unreasonable classification. It is part of a large, integrated legislative scheme—replicated in various ways by many states at one time or another—to keep beer and liquor interests apart, the better to regulate both and thereby promote temperance and a well-regulated alcoholic beverage industry as a whole. To this end, the

prohibited-interests statutes generally thwart the sort of aggregated interests that precipitated alcohol-related social ills (including cheap liquor, excessive consumption and market manipulation) prior to Prohibition.

Many courts have recognized that maintaining not only vertical market segmentations but also horizontal market segmentation serves that purpose. *See, e.g.*, *Dickerson v. Bailey*, 336 F.3d 388, 397 (5th Cir. 2003) (noting the three-tier system helps control consumption and prevent companies with monopolist tendencies from dominating all levels of the alcoholic beverage industry); *Cal. Beer Wholesalers Ass'n, Inc. v. Alcoholic Beverage Control Appeals Bd.*, 487 P.2d 745, 749 (Cal. 1971) ("California's alcoholic beverage control laws and tied-house provisions effectuate the legislative objectives" of temperance and competition); *Dep't of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.*, 128 Cal. App. 4th 1195, 1207 (Cal. Ct. App. 2005) (noting that California's alcoholic beverage regulatory scheme was intended to prevent "the ability and potentiality of large firms to dominate local markets through vertical *and horizontal* integration") (emphasis added); *Granite State Grocers Ass'n v. State Liquor Comm'n*, 289 A.2d 399, 402 (N.H. 1972) (observing that an "obvious purpose" of its alcoholic beverage regulatory scheme is "to supervise and to *fractionalize* the beverage industry") (emphasis added); *Neel v. Tex. Liquor Control Bd.*, 259 S.W.2d 312, 317 (Tex. Civ. App. 1953) (recognizing Texas's legislative policy to keep large liquor interests under control by preventing both vertical and horizontal integration in the production and distribution of alcoholic beverages).

Monarch purports to concede the legitimacy of tied houses policies, but argues without any support that such policies are rationally limited only to prohibitions on vertical integration. Appellant's Br. 49–50. But tied house restrictions protect the independence of permittees at each tier not just from the threat of a large permittee expanding vertically into other tiers, but more generally from the potential abuse of economic power over a permittee on another tier. If a single wholesaler came to dominate the wholesale tier across all three categories of alcoholic beverages, the same evils would ensue that tied house policies were designed to prevent. *See* Pamela S. Erickson, *Return of the Tied House? The Problems of Domination by Large Companies*, Campaign for a Healthy Alcohol Marketplace (Dec. 2015), http://healthyalcoholmarket.com/pdf/newsletterdecember2015.pdf (noting that a wholesaler's ability to reach all product lines can result in a "virtual tied house" situation).

### C. Beer wholesalers, but not liquor wholesalers, benefit from franchise protections, an advantage that reasonably justifies maintaining the barrier between beer and liquor distributors

The General Assembly is also justified in keeping liquor and beer wholesalers legally separate given the differences in their current legally protected interests. The business of beer wholesaling in Indiana is much different from the business of liquor wholesaling. Because of this difference, not only are beer and liquor wholesalers not similarly situated, but also there is a rational basis for not opening the alcoholic beverage market to direct competition between beer and liquor wholesalers.

To begin, Monarch has written contracts with producers of beer, which contain provisions guaranteeing the wholesaler's inventory will be repurchased by the producer if the contract is terminated. Terry Dep., ECF No. 81-1 at 41–46, 52. Some of these contracts may also provide wholesalers with additional compensation from the producer should the contract be terminated. *Id.* at 41. Monarch also enjoys exclusive rights of distribution to all dealers and retailers within their particular territories. *Id.* at 63, 94–96, 98. With respect to wine distribution, Monarch's contract with Gallo has no analogous exclusivity provision. *Id.* at 95–96.

But most fundamentally, *Indiana law* protects Monarch and other beer wholesalers from loss of business. It is "unlawful for a beer wholesaler or a primary source of supply to cancel or terminate an agreement or contract between a beer wholesaler and a primary source of supply for the sale of beer, unfairly and without due regard to the equities of the other party." Ind. Code § 7.1-5-5-9(c). Further, a beer supplier who acquires the rights to a particular brand of beer from another supplier cannot transfer the distribution rights to a new wholesaler unless the new wholesaler compensates the existing wholesaler for the fair market value of the existing wholesaler's right to distribute the beer. Ind. Code §§ 7.1-3-25-7 to -9, and -13. Monarch itself has sued beer producers that have terminated contracts without paying compensation. Terry Dep., ECF No. 81-1 at 84–87, 89.

In light of these protections, the prohibited-interest laws are especially important protections of industry dominance by incumbent beer wholesalers. If the Court were to enjoin the prohibited-interest laws, an incumbent beer wholesaler

such as Monarch could acquire a liquor permit and then easily compete for liquor suppliers, particularly since there would be little additional warehousing or other capital costs. *Id.* at 108–10. Additionally, when a brand of liquor is purchased by Monarch's liquor supplier, Monarch would be able to distribute the brand without compensating the existing liquor wholesaler the fair market value of the right to distribute the brand. A current liquor wholesaler, however, would not have the same access to beer suppliers, who would remain indentured to their current distributors (such as Monarch) absent massive capital investments in the purchase of beer supplier contracts. Likewise, when a brand of beer brand is purchased by the new beer (formerly liquor) wholesaler's supplier, the new beer (formerly liquor) wholesaler would only be able to distribute the brand by compensating the existing beer wholesaler the fair market value of the right to distribute the brand. Such a market shift toward incumbent beer distributors is all the more likely to the extent producers seek deals with a single distributor for a given period, the better to control how their brands are marketed. Monarch's experience with Gallo demonstrates exactly this phenomenon. *See id.*

What is more, existing franchise protections for beer distributors exacerbate the threat that greater market power may result in the sale of cheap hard liquor, thereby promoting intemperate consumption. As the district court observed, a beer distributor that acquires liquor clients at low marginal cost might be able to develop business by maintaining lower hard liquor prices. App. 14.

In response, Monarch first contends that, because their franchise protections did not exist in 1935, those protections cannot justify continuation of the prohibited-interest statutes, citing *Zobel v. Williams*, 457 U.S. 55 (1982). Appellant's Br. 41–42. *Zobel* does not support the formalistic argument that the only rational bases that may be considered are those predating enactment of the challenged law. Rather, the Court's only concern in *Zobel* was whether future benefits to Alaskans could be calculated based on prior residency, with the objective of promoting long-term citizenship. *Zobel*, 457 U.S. at 61. Since paying more money to long-timers would itself do nothing to attract and keep new residents, the benefits law failed. *Id.* at 61–62. That analysis says nothing about whether a new regulation protecting a business's current contracts can itself justify continuation of an older regulation curbing that business's new contracts.

Monarch also seeks to rebut the significance of the franchise protections with the non-sequitur that it would still face stiff competition from other incumbent beer wholesalers. Appellant's Br. 42. The imbalance that justifies maintaining the prohibited-interest laws is not among current beer distributors, but between current beer distributors (who could compete for liquor suppliers without paying off incumbents) and current liquor distributors (who could compete for beer suppliers only by paying off incumbents). In this respect, Indiana's historical and supposedly "unorthodox" approach to beer-liquor market separation at the wholesale level also distinguishes the consequences of its franchise protections for beer distributors. Other states have never had to worry about what happens when liquor-beer

barriers are lifted, but beer franchise protections remain in place. It's not about "artificially high beer prices," but market upheaval.

Accordingly, beer distributors' franchise protections independently justify maintaining the beer-liquor distinction. Alcohol is a highly regulated commodity, and over the years those regulations have created incentives for investment-backed economic behavior and expectations that underlie current alcohol market structures—Monarch and other beer distributors included. Monarch complains that the prohibited-interest laws have "permitted Indiana's liquor distributors to flourish, insulated from competition by beer wholesalers." Appellant's Br. 49. Yet if so, its own franchise protections represent precisely the same thing—protection of its entrenched interests in beer suppliers from bidding wars that might erupt if supplies could switch distributors.

Overturning the prohibited-interest laws at this point threatens large-scale disruption in the alcohol distribution market, which the legislature surely may seek to avoid, regardless how it might ultimately play out. Monarch protests that "[p]rotecting the economic interests of favored actors such as liquor wholesalers is not a legitimate state interest." Appellant's Br. 51. But even aside from undercutting Monarch's own legislatively enacted franchise protections, that argument ignores the valid public purposes served by preventing market upheaval. Maintaining the current highly regulated system protects consumer interests, maintains the State's relative regulatory power over individual businesses, and provides fairness to all permit holders.

What is more, there is no protection of "favored" actors, as all similarly situated interests get the same protections and restrictions. It is not a question of whether the legislature may bestow benefits or impose burdens on groups it otherwise favors or disfavors. *See, e.g.*, *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612 (1985); *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 485 U.S. 360, 371–73 (1988). It is rather a question of whether the legislature may intentionally structure markets in a particular way to achieve legitimate objectives and then refuse to pull the rug out from under those who have built their businesses based on that structure.

### D.    Monarch has not negated, and cannot negate, these interests and their connection to the prohibited-interest statutes

#### 1.    Monarch's historical counter-narrative, even if accurate, has no bearing on the legitimacy of the State's objectives

Monarch focuses much of its attention on the theory that the prohibited-interest laws are unconstitutional because they were "originally adopted in order to promote and protect a patronage system that operated to the benefit of state and local politicians." Appellant's Br. 6. The district court correctly rejected "[t]his line of attack," App. 13, because it "ignores the rule that 'we never require a legislature to articulate its reasons for enacting a statute, [and] it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.'" *Id.* (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 315). Indeed, courts concern themselves only with whether the law may conceivably

46

serve legitimate government interests. If so, the law must be upheld, regardless whether it also serves legislators' narrow political interests.

a. First, because it deems Indiana's regulatory approach "unorthodox," Monarch cites *Romer v. Evans*, 517 U.S. 620 (1996), and *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985), to support its claim that the State's asserted justifications are disingenuous. But concern about "orthodoxy" or "direct means of regulat[ion]" (Appellant's Br. 39) mattered in those cases only because lurking beneath the surface was a concern about invidious discrimination against vulnerable groups, namely gays and the disabled. Monarch's implicit claim that beer distributors are a similarly vulnerable target of *sub rosa* "animus" can hardly be taken seriously.

b. To the extent Monarch protests that the legislature did not explain in detail its particular rationale for the prohibited-interest laws, its complaint is both mistaken and irrelevant. "[T]he absence of legislative facts explaining the distinction on the record . . . has no significance in rational-basis analysis." *Beach Commc'ns*, 508 U.S. at 315 (quotations and internal citation omitted). Again, courts may "never require a legislature to articulate its reasons for enacting a statute . . . ." *Id.*

The Indiana General Assembly only rarely explains its rationales for the laws it enacts, but that has never justified invalidating them based on reports of nefarious background motives. Because the General Assembly does not keep substantive legislative history such as hearing transcripts and substantive

committee reports, courts interpreting Indiana law are accustomed to interpreting statutes and weighing their constitutionality based solely on statutory text and hypothesized objectives without the benefit of any official legislative explication of their purpose. In such situations, far from having license to infer a damning legislative objective, courts must presume statutes to be legitimate and constitutional until the challenger attacking the rationality of the legislative classification meets his burden "'to negative every conceivable basis which might support it.'" *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Moreover, as it happens, in this case the legislature went to the trouble to express its overall rationale for its liquor control scheme, which it in turn has expressly designated to support of any classifications it has drawn:

> The following are the general purposes of this title:
>
> (1) To protect the economic welfare, health, peace, and morals of the people of this state.
> (2) To regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages.
> (3) To regulate the sale, possession, and distribution of tobacco products.
> (4) To provide for the raising of revenue.

Ind. Code § 7.1-1-1-1.

> The classifications and differentiations made in this title are real and are actually and substantially related to the accomplishment of the purposes of this title.

Ind. Code § 7.1-1-2-1.

Accordingly, it is only appropriate for the Court to accept the explanation that, as discussed earlier in the brief, the statutory distinction between liquor and beer wholesalers was enacted to further valid interests. The district court appropriately granted summary judgment against Monarch even while acknowledging that "Indiana may not have chosen the 'best way' to ensure high prices for alcohol and to realize its public policy goals . . . ." App. 16. As the court correctly explained "[r]ational basis review necessarily elides judicial fact-finding . . . [and o]urs is not to determine the best way to regulate an industry or to judge the wisdom or logic of legislative choices." *Id.*

c.     In all events, Monarch's counter-narrative, while (if accurate) it conveys historical pursuit of unfortunately narrow political interests, is hardly shocking or even particularly worrisome. Its basic point seems to be that creating and maintaining separate interests in a variety of alcohol permits, particularly at the wholesale level, served cynical political and patronage interest. Oftentimes, sadly, such is politics. Suffice it to say, if suspicions about politicians' personal and political interests could defeat legislation that otherwise serves legitimate objectives, we might well have few laws that could withstand scrutiny. At the very least, the courts would be busy dissecting every statute for signs of impermissible motivations rather than legitimate objectives.

Furthermore, the broadside attacks launched by Monarch's news accounts of the time indict not the prohibited-interest laws so much as the three-tier regulatory system in general. *See, e.g.*, ECF No. 95-10 (critiquing the "care with which the bill

provided that the business of selling [alcohol] shall be confined to politically selected favorites and the administration of the law shall be at the pleasure of the administration through its own appointees"); ECF No. 95-11 (complaining that the Alcoholic Beverages Commission "is given almost czaristic powers to regulate and control the industry" using as a "whip for control . . . its power to issue and revoke licenses"). The authors of those pieces would apparently have preferred either greater local control over the entire industry, *see id.*, or perhaps even "a return to pre-prohibition days practices and methods . . . ." *Id.*

In that regard, Monarch's bad-motives argument proves far too much: It implies that Indiana's entire 80-year-old alcohol regulatory system must come crashing down because it represents a devil's bargain of politics and business. One wonders whether Monarch is truly prepared to accept the implications and consequences of its legal theory, including the end of its own protected interests in serving its beer clients, not to mention the end of the statutorily created wholesaler role. For if long-ago patronage and other venial political sins spell doom for laws limiting Monarch's ability to sell Gallo's liquor along with Gallo's wine, they must surely do the same for laws precluding Gallo itself from selling directly to retailers and even consumers. And in the wide-open world where the Equal Protection Clause precludes Indiana from structuring the alcohol market from grains to groceries, there would seem to be little need for a business such as Monarch that actually *produces* nothing.

Finally, Monarch's bad-motives theory supports little more than constitutional formalism. Legitimate conceivable government interests exist to justify the prohibited-interest laws. So even if unsavory historical interests were somehow to poison the current iteration of those statutes (a doctrine federal courts may not embrace), the General Assembly could simply re-enact the restrictions with *appropriate* attitudes and motivations, and the function of judicial review would be reduced to pursuing abstract historical reckoning rather than consequential legal determinations. Accordingly, the Court should remain focused on government objectives, not the possibility that legislators might at one time have acted from narrow political interests.

### 2. The availability of other controls does not undermine the prohibited-interest statutes

Monarch argues that making a connection between the Prohibited Interest Statutes and combatting cheap liquor "defies plausibility." Appellant's Br. 37. Monarch says this, however, not because it is irrational to think that less efficient markets will yield higher prices, but because Indiana has not taken other steps that Monarch deems prudent for maintaining high liquor prices, such as imposing high excise taxes. Appellant's Br. 38. Monarch also chides Indiana for not "prohibiting volume discounts," or "requiring minimum mark-ups." *Id.* Indiana's refusal to take every available action in pursuit of higher liquor prices, says Monarch, "casts considerable doubt on the district court's conclusion that the at-issue prohibition . . . could rationally be thought to raise liquor prices." Appellant's Br. 39. This statement is a non-sequitur. Whether a regulation may rationally be thought to

promote a desired result does not depend on whether other regulations might also achieve that result.

Monarch's position ignores the practical reality that the alternative means it advocates to prevent the evils of tied houses and exercise of excessive power by wholesalers all encounter difficulty, burdens and costs in detecting violators and prosecuting them. It is far easier to regulate permittees' interests as part of the permit approval process than to monitor their daily activities and prosecute violations.

More to the point, the precise mix of regulations and taxation that the General Assembly uses to achieve its goals is not an issue of constitutional dimension. As they adopt public policy, legislatures are confronted with an infinite array of competing objectives and must often balance them against one another. To the extent the legislature is interested in maintaining high liquor prices, it may have concluded that market separation at the distributor level represents the most balanced means of doing so. Perhaps it believes that keeping liquor and beer separate prevents the sort of scale-related efficiencies that can drive down prices. But at the same time, perhaps it has concluded that more robust taxation or minimum price requirements represent the sort of price-support overkill that can incent the creation of black markets. *See* Cook at 29.

Next, Monarch criticizes the State's anti-cheap-liquor rationale for the prohibited-interest statutes because it "rests on a multi-step hypothetical causal chain with each step more speculative than the previous one." Appellant's Br. 41.

It critiques the State's understanding of "the effect of franchise protections," asserts that "there is no evidence that franchise protections have undermined the price of liquor" in other states, and claims that concerns over cheap hard liquor are "flatly contradicted by Indiana's experience with wine." *Id. at* 42–43.

These arguments all rest on the false premise that Monarch can prevail simply by having a better economic argument, a premise this Court has rejected out of concern for reintroducing *Lochner*-type economic rights. *See, e.g., Gosnell*, 59 F.3d at 658. As the district court correctly held, the State "need not rely on 'market realities' to support their reasons for these controls; they need only present rational speculation, which a court [is] compelled to accept." App. 17.

Moreover, Monarch's comparisons to other states' experiences are inapt precisely because no other state has faced the prospect of eliminating prohibited-interest barriers in the face of franchise protections for an entire market segment. And the point of Monarch's comparison to the wine market is hazy. Monarch seems to suggest that, if given the opportunity, beer distributors would not distribute liquor in mass quantities. But one would have thought that doing just that was the entire point of Monarch's multi-front attack on the prohibited-interest statutes. In any event, as Prohibition and its aftermath amply demonstrate, there is no comparing the causes and consequences of cheap wine and cheap liquor—or at least the legislature is entitled so to conclude.

In any event, the Court is in no position to re-calibrate the regulatory and taxation balance the legislature originally struck eighty years ago and has adjusted

in the intervening decades. *Cf. Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955) ("[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.").

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court affirm the judgment of the district court.

Respectfully submitted,

GREGORY F. ZOELLER
Attorney General of Indiana

*s/Thomas M. Fisher*
THOMAS M. FISHER
Solicitor General

HEATHER HAGAN McVEIGH
LARA LANGENECKERT
JONATHAN R. SICHTERMANN
Deputy Attorneys General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov

## CERTIFICATE OF WORD COUNT

I verify that this brief, including footnotes and issues presented, but excluding certificates, contains 13,805 words according to the word-count function of Microsoft Word, the word-processing program used to prepare this brief.


By: *s/ Thomas M. Fisher*
    Thomas M. Fisher
    Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which sent notification of such filing to the following:

Kannon K. Shanmugam
Amy Mason Saharia
Allison B. Jones
Katherine Moran Meeks
WILLIAMS & CONNOLLY LLP
kshanmugam@wc.com
asaharia@wc.com
ajones@wc.com

Richard A. Smikle
Derek R. Molter
ICE MILLER LLP
richard.smikle@icemiller.com
derek.molter@icemiller.com

*s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-6255
Facsimile: (317) 232-7979
Tom.Fisher@atg.in.gov